And call the first case, Board of Education v. CM. Good morning, your honors. May it please the court, my name is Marion Walsh, and I am here representing the appellants. Ms. CM, on behalf of her child, a student with a disability, PG. I also have my colleague here, Ms. Erica Fitzgerald. Your honors, as you know from the papers, the primary issue here is when the parents' claims of gross misjudgment and bad faith under Section 504 of the Rehabilitation Act of 1973 accrued, and whether indeed these claims were filed in a timely fashion. Your honor, we submit they were, and your honors, the impartial hearing officer after a trial that lasted and extended for a full year with almost 300 exhibits, over 20 witnesses, and extensive testimony, found that these claims accrued during January to June 2012, and thus were in place. Your honor, the student now has aged out of special education. He did receive his compensatory year at the Whitney Academy, the specialized school for students with dual diagnosis, but he has aged out. He now is in a group home with a supportive placement upstate. So he was at Whitby for what period of time? He was there for two years, your honor. Which school years? Okay, he was there for the 16-17 school year and the 15-16 school year, and then indeed, so for two years, and part of that was paid, was by Clarkstown, the Clarkstown School District, and part of that was by the Pelley, the North Rockland School District, and that was by order of a preliminary injunction on July of 2016. And remind me where he was for the previous two years, two years before that. Your honor, he was at the Clarkstown School District, and that was because in August of 2012 and September 2012, after not receiving a residential placement from the school district due to their bad faith and gross misjudgment, he was, the parent moved him to a group home, and because he moved to a group home out of the North Rockland School District, he then had to attend the district of location, which was Clarkstown, Clarkstown School District. Let me ask, why didn't your client have all the information that she needed to bring suit in June 2011, as the district court concluded, as opposed to 2012? Because she knew she didn't have a residential placement, she had a psychiatrist and a psychologist who both strongly advised her residential placement, so why isn't that the trigger? Your honor, the claims of gross misjudgment and bad faith are fundamentally different than the May of 2000 disagreement. Admittedly, the parent did disagree with the CSE meeting in May of 2011. She had her therapist there, she had the therapist there, and she was concerned about his classification. But your honor, it wasn't until January to June 2012, as the IHO documented, that the student's behavior severely deteriorated and decompensated, and he really became a danger to himself or others. He eloped, was held by others as There's certainly evidence that the behavior changed and got worse and the father died. Is there a duty on the part of a school district to continue to monitor, to take additional action, to revisit its placement decision? Your honor, that is the fundamental issue here, and why this case . . . Well, I asked it, so . . . Thank you, I appreciate that. What is there in the statute or in the regulations that This case was brought under IDA and Section 504. Districts have an affirmative duty to provide a free, appropriate public education, and that necessitates monitoring a student's progress, and it necessitates active and affirmative action. So your honor, when the student declined from January to June 2012, the district did have a duty to reconvene a CSE. Indeed, they did reconvene a CSE in February 2012, and both the district court and the district aired in front . . . Did the mother, during that time period, make any requests of the school district? Yes, your honor, she made . . . What did she do? She made many requests, your honor. First, at the CSE in February 2012, which was during the 11-12 school year, and at that CSE, the district had an obligation to consider the residential placement for that year. She did request a residential placement then. After the CSE, she received a prior written notice, and she then called . . . The prior written notice said to call Ms. Heaney in the district. She called many times. The district never returned her calls. When did she first request a residential placement? Your honor, it was . . . She had requested it a little before the May 2011 CSE, but the May 2011 was one of the first times. And why did she request it? Your honor, the student's therapist, Ms. Meyerson, who was recognized as an expert at the hearing, did recommend it, but at that point, as I noted, it wasn't the crisis that it was later. Her own expert recommended it at that time? Yes. Prior to the 2011 meeting? There was an evaluation that was submitted at the 2011 meeting in a letter. Was she represented during that time period by counsel? No, your honor, she was not. But she had . . . Who else did she have at the 2011 meeting in addition to the psychologist, which she had retained, right? Yes, your honor. She did have an advocate, your honor, from the Judge Rotenberg Center. Remind me what the responsibilities of an advocate . . . The advocate was helping her a little bit on the process, but did not really educate her on the full extent of what her rights were. And he was not an attorney. . . The process was . . . You know, how to seek a residential placement, and he was particularly from one state-approved setting, which is not . . . I don't think it's state-approved anymore, the Judge Rotenberg Center. So he was really educating her about that placement and how to go about getting a residential placement. That was one of the primary purposes of the 2011 meeting, was it not, to make her case for residential placement? Your honor, there was a disagreement there, but . . . Yes, your honor, that was one of the purposes. However, as noted, that was a very different fact pattern, and the student's levels of . . . present levels of performance and his educational achievement were significantly different than they were in January, June 2012, and that is why there is the distinction between . . . But nevertheless, in 2011, the parent believed that her rights under the RDEA were violated as a I don't think the record quite reflects that, because the parent was still quite unclear on her rights, and your honor, at the CSE meeting, if you recall, the district CSE chairperson, who was completely discredited by the impartial hearing officer, stated that she had no rights and that there was nothing she could do. Thank you. So, your honors . . . I'm sorry. Are you going to continue to reserve three minutes in rebuttal? Yes, your honor. Okay. Your honors, so . . . I will hear from you then. Okay, thank you. Good morning, your honors. May it please the court, Neal Chaudhry for Plaintiff Appellee School District. As my esteemed colleague and opposing counsel has stated, the issue before you is whether the parents, and by virtue of a representation of a child, the student's claims accrued prior to the applicable statute of limitations. The district submits that . . . Do you agree with your colleague's statement that under the Rehabilitation Act and the IDEA, a school district has a continuing duty, even after a placement decision, to monitor students' progress and to see whether that initial decision is still an appropriate one? I would agree with the premise of that statement by itself, but not in the context that Ms. Walsh has presented it to you. Isn't there some evidence in the record that during the January-June 2012 term, the mother requested a reevaluation, a placement. She made phone calls. No, there is nothing in the record. To clarify the record before this court, your honor, the February 2012 CSE meeting was an annual review to discuss the program for the 2012-13 school year, which is not an issue before this court or ever was an issue before the prior below administrative proceeding. But the question is, at that time, should the school district have looked at what was going on and then . . . or at least isn't this a viable claim, that the school district should have noticed that the father had died, that the behavior had deteriorated and revisited the placement decision for that year? No, your honor. If I could explain why. The district's obligation is to monitor the student's academic, educational and behavioral concerns as they affect the student's ability to access academic instruction. While it's certainly sad and the district sympathizes with the issues that took place outside the school setting, those issues were in fact outside the school setting. The father passing away, the issue about the student being bullied in his neighborhood, not in the school setting. The issues with the student running into law enforcement outside the school setting. While the district . . . Those things have impacted his progress in the school setting? No, because there's no evidence in the record that it did. The student's behavior has actually improved throughout the course of the period that's at issue in this proceeding. There is a document in the record, a document from the school psychologist recommending the removal of a one-to-one aid in May of 2011 because the student's behavior had improved so much. That aid was never instituted and there was no need to institute that aid for the 2011-12 school year, nor are there any incident reports for the 11-12 school year that indicated that the aid needed to be reinstituted. While what happened outside the school setting is sad and is something that nobody wants to see, it's not necessarily the responsibility of a school district to intervene in every single incident or every single situation that a child might find himself in. You said this obligation to monitor at the beginning of your statement. Are you saying that they impose equivalent obligations on the school system to be apprised of the ongoing development of the student and his program? Two things, Your Honor. The IDEA and 504 do different things. The IDEA is a funding statute first and foremost, and in order to receive funding, school districts must provide a free, appropriate public education for a student. Section 504 simply says you cannot discriminate on the basis of disability. While there are 504 regs, all eight of them, that the Department of Education has instituted for making sure that appropriate accommodations are met, and yes, there is some overlap, there are two distinct things. Two, just to go back to the point about the continuing obligation, it's in the record and it's not necessarily put in the appendix or special appendix. The issue was statute of limitations, but it is in the underlying record that the district actually communicated with outside agencies. A SPOA was set up and the district did communicate with the SPOA. Sorry, shorthand for single point of access. I realize there's a lot of alphabet soup involved in this matter. Where the district actually did communicate with other state agencies that do have a statutory responsibility for the student's well-being outside of the school setting. How about if we agree with the district court that the Section 504 claim here is untimely under a three-year statute of limitations? I'm assuming that that means we don't need to address your argument as to the applicable statute of limitations. Is that correct? I would agree with that, Your Honor. If you agree with Judge Bassetti's decision, you do not have to reach that issue. We made the argument because we were, frankly, caught off guard by the analysis that was put forth by the IHO, or I should say lack thereof, as there was no discussion regarding the accrual date and it was just timely. We disagreed with the IHO and we made every argument we could to preserve the district's rights here. I see I have more time, but I just note for the record that deference to the SRO, that was a point that was brought up by a defendant appellant, that puts the parent and the student between a rock and a hard place. As this court knows, on issues such as statute of limitations, that is a legal determination. That is not necessarily a determination that you are bound to by the lower court or the administrative proceeding. Questions of fact that are relevant to educational policy, that does require some deference by this court, but not on legal issues such as statute of limitations. The parent submits that, notwithstanding that there should be deference to the IHO. What we would note is that in these situations, because the facts that give rise to both the parent's IDEA and 504 claims arise from the same set of circumstances, namely the May 2011 CSE meeting, then any analysis, if there was to be deference, should be given to the SRO, which was the more reasoned analysis of the situation, specifically the May 2011 and the June 2011 receipt of the prior written notice determining what the district's position was on residential placement. I also note for the record that while we believe that the argument was waived by the parent at the lower court level, the parent, in her affidavit before the injunctive relief that was granted by Judge Presetti in lower court, stated in its document 27 in the lower court record, the court has no need to consider whether there was a continuing violation which would circumvent the statute of limitations. If you recall, the lower court summary judgment proceedings, it went district, parent, district, parent in terms of the briefing schedule. The parent essentially had a SIR reply, and at no point did they make the continuing violation exception argument. It was only after Judge Presetti's decision came down, and he noted that there was no continuing violation exception, did the parent first bring the argument before this court. On the issue of whether it's a two- or three-year statute of limitations, if we do reach the issue, is Morse binding on us? No. What we submit is, Morse is binding. We're not asking you to overrule Morse. What we're asking you is to distinguish Morse from situations such as this. We would respectfully request that the Second Circuit adopt a Third Circuit standard on IDEA claims and 504 claims, where the claim is based off the same set of facts and circumstances. This is different from, say, there's a claim of a violation under the IDEA because there's a disagreement on program and placement or services, and at the same time a one-to-one aide abused a student because of his or her disability. I think that's a clear-cut case, and in that situation you would use Morse as the three-year standard because that is more akin to a personal injury action. Here, it's important to note in the underlying due process complaint, the original document that started this in January 2015, and I'm quoting from the document, the parent alleged that the district violated 504 by quote, by failing to provide an appropriate residential placement and appropriate support services. There's no allegation of actual discrimination on the part of the district or its staff or anyone contracted by the district on the basis of the student's disability. In this situation, they simply disagreed with the residential placement and said that disagreement constituted a violation under both the IDEA and Section 504. If that's the claim by the parent . . . Why isn't that an argument that the Third Circuit may have gotten it wrong in having this special rule for a certain type of claim? Because then you're going to have to do a careful perusal of the complaint to distinguish some Rehabilitation Act claims from others, even in the context of children in educational settings, in order to determine the statute of limitations. Well, I think that careful perusal has already been, for lack of a better term, forced upon the courts. As you guys know, last year in Napoleon v. Fry, the Supreme Court distinguished, and I should say they set forth a standard for when claims under 504 and the IDEA need to be exhausted. So in a situation where claims need to be exhausted, it only makes sense to adopt the IDEA statute of limitations, because if the claims are so intertwined, why should a school district be subject to a different statute of limitations for the same alleged wrong under two different statutes? The IDEA prescribes that there be a prompt resolution to any disputes. It's not only something that's recognized in the courts, but it is actually contained in the language of the statute. There's multiple methods for resolving disagreements. Mediation, a resolution session once a due process complaint is filed. In this instance, if these situations can't be resolved promptly, you go to a hearing that is put in a rather aggressive schedule. As Ms. Walsh has stated, there were 11 hearing dates in the year of 2015 after the due process complaint was filed. That's unheard of in court. That's something that goes very quickly. If a district has to defend that and then is still subject to the same claim, essentially, that it failed to provide a residential placement three years later, then the district will never get any rest. It defeats the purpose of the statute of limitations. At some point, the district has to be able to say, or any defendant has to be able to say, enough. You had your chance. You had your opportunity. The parent had more than adequate notice of what the district's actions were and what her rights were under the act. We have a right to not have to look over our shoulder at some point. Thank you. Your Honor, I will be fast. Remind me specifically what relief you're seeking here. Your Honor, at this point, the preliminary injunction has been granted. The student was placed for the year. However, the claim is not moot because under Judge Persetti's order, there is still the possibility of the district recouping costs from the parent for this. In addition, Whitney Academy was not fully paid. It was only a month at the end, so there are still issues. We're asking that the court reverse the vacating of the preliminary injunction as well as reversing the district court decision. So what would the decreed paragraph in that say? You want them to be ordered to do what specifically? Your Honor, we're asking that the court reverse the district court decision as erroneous and reverse the vacating of the preliminary injunction and uphold the IHO decision. That's the part of relief you want, right? We already received that, Your Honor. So what do you want to have happen? We want the decision to be reversed so that there is no possibility of recoupment of costs. And the recoupment we're talking about is for the single year? Yes, Your Honor. How much was that? It's approximately $250,000 for tuition a year. Your Honor, I just want to correct a few errors, if I may. Opposing counsel honestly has created a fiction about the student state between January 2012 and the district's obligation. Indeed, as you know, in the seminal case of Mrs. B, the Milford Board of Education, the court has held Did it show that there was an impact on what was happening in school? Yes, Your Honor. It does reflect that. What is there? Your Honor, the student was stealing things. He was eloping at home. He was being bullied. He was switched from being on the regents track to the alternate assessment. So you can see there was a decline in his academic functioning. He was only reading on a third grade level after the year before, and his behavior was completely dysregulated. And indeed, in Mrs. B, the second circuit has held that it is appropriate to look at the home-based setting as well. I wanted to ask because there seem to be two narratives here. One is that there was a bad decision in 2011. Your client sought a residential placement, didn't receive the residential placement. And then in 2012, other things happened in the student's life, and the effects of that bad decision became more and more apparent. In the case law, that is when the consequences of the decision emerged. But the decision, the discriminatory act, was still the decision not to place in residential placement. You say, no, no, there was a gross misjudgment in 2012. But what precisely is that gross misjudgment in 2012? Because there was a CSE convened, and they did again say no residential placement. But you're not complaining about that. That was brought to the Clarkstown School District, if I'm understanding correctly. No, Your Honor, well, Your Honor, respectfully, the CSE from our position did have the obligation at that meeting to evaluate the student's functioning, and there was such a discrepancy between how the student was doing and his significant decline that the CSE had an obligation for the remainder of that school year, and that's in the IDA. When the CSE convenes, it has to look at the present levels. Indeed, the prior written notices said that they were looking and evaluating the student's current program. That was a discrete and separate act of gross misjudgment and bad faith, and this is not just the consequence from the May 2011 meeting. The parent could not have possibly understood the gross misjudgment and the student's decline that was going on later on. If I ask for residential placement in year one, and then year two at the review meeting, I renew my request for a residential placement, and my position is that, as a parent, that it's more important now than ever. Year three, I don't get it. Year three, I do the same thing. Year four, I do the same thing. Under that scenario, when does the statute, let's assume it's a three-year statute, when does it start to run? What triggers the statute? Your Honor, that's an excellent question, and it's necessarily, as the courts have held, a very fact-based inquiry of when the accrual actually occurs. Here, we submit the IHO, after viewing the credibility of witnesses and hearing the entire record, found that it accrued between January and June 2012. It accrues when there are acts of gross misjudgment or inaction and bad faith. And it would be very fact-dependent. It may be that it really depends on the facts. So, in other words, you're telling us that you can't, in order to determine when the statute starts to run, some sort of factual hearing or trial or factual finding is required. Is that your position? Your Honor, the case law does say that when the claim accrues, it is a fact-based decision. So, yes, we do believe that that is accurate. And here, the IHO did find it accrued in February, June 2012. But, Your Honor, no, it does not. Because we're looking at discrete and separate instances and occurrences. Year 1, no, you don't get a residential placement. Year 2, no, you don't get a residential placement. Year 3, no, you don't get a residential placement. Year 4, no, you don't get a residential placement. I will accept those are discrete acts. Assuming hypothetically that they're discrete acts, when in that scenario would the statute start to run? We're looking under Section 504 when the gross misjudgment and bad faith accrued. It could be in all the scenarios you talk about, maybe there was no gross misjudgment and bad faith. It was a hypothetical question I put in here because we have to fashion a rule that applies not just to your case but to other cases. For obvious reasons, people both in your position and in the school district's position are entitled to know when there is relief from the claims. People in your position have to know when they've got to file them. People in the school district's position have to know when they're off the hook. I would be helped by your articulation of what rule you think we should announce. Your Honor, I think there should be a rule under the IDA and Section 504 that a claim accrues when there has been not only at the CSE when a decision is made but if during the year there is a significant denial of FAPE and also gross misjudgment and bad faith, which is a corollary. The claim accrues then if there has been a significant change in the student's performance and the district has denied FAPE and shown gross misjudgment and bad faith. It has to be fact-based. It depends on the circumstances. Under the IDA, if you think about it, a CSE denied a residential placement in May 2011. If there's a significant decline, if a student had a traumatic brain injury, they would have to consider a new placement. It was akin to that. When the student's father died, it was that kind of decompensation, that kind of falling apart. That's the kind of thing districts have to look at. They're obligated to look at. Your Honor, I'm out of time. Thank you so much.